UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

BRADLEY PATRICK GAISER, SR.,          :

                 Plaintiff,    :    13 Civ. 8234 (HBP)

   -against-                          :    OPINION
                                  <u>AND ORDER</u>
COMMISSIONER OF SOCIAL SECURITY,   :

                Defendant.    :

-----------------------------------X

       PITMAN, United States Magistrate Judge:

## I.  <u>Introduction</u>

         Plaintiff, Bradley Patrick Gaiser, Sr., brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB").  Plaintiff and the Commissioner have both moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docket Items 14 & 17).  The parties have consented to my exercising plenary jurisdiction in this matter pursuant to 28 U.S.C. § 636(c) (Docket Item 10).

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is granted, and plaintiff's cross-motion is denied.

## II.  Facts

### A.  Procedural Background

Plaintiff filed an application for DIB on May 26, 2011 alleging that he had been disabled since January 1, 2011 (Tr.[1] 11).  Plaintiff alleges that he was disabled due to an injury to his right knee that rendered him unable to work (Tr. 122).

After the Commissioner denied plaintiff's claim on July 19, 2011, plaintiff requested and was granted a hearing before an Administrative Law Judge ("ALJ"); the hearing was held on May 24, 2012 (Tr. 11, 52-58, 74).  In a decision dated August 30, 2012, the ALJ, Roberto Lebron, determined that plaintiff was not disabled under the Act from January 1, 2011 through the date of the decision (Tr. 17).  The ALJ's decision became the Commissioner's final decision on October 22, 2013 when the Appeals Council denied plaintiff's request for review (Tr. 1-4).

---

[1]"Tr." refers to the administrative record that the Commissioner filed, pursuant to 42 U.S.C. § 405(g) (see Notice of Filing of Administrative Record, dated January 22, 2014 (Docket Item 24)).

Plaintiff commenced this action on November 15, 2013 (Docket Item 1).  The Commissioner and plaintiff filed their cross-motions for judgment on the pleadings on July 16, 2014 and August 18, 2014 respectively (Docket Items 14 & 17).

B.  Plaintiff's
    Social Background

Plaintiff was born on October 5, 1961 (Tr. 104).  He graduated from high school and attended college for two years (Tr. 123).  Plaintiff began working as a firefighter with the Scarsdale Fire Department in August 1983 (Tr. 27-29, 123).  Other than the in-house training he received at his job, plaintiff has no specialized or vocational training (Tr. 27-28, 43, 123).

Plaintiff reported that he typically worked four twelve-hour shifts per week at the firehouse (Tr. 123).  He stated that his work as a firefighter involved training, driving, operating equipment, search and rescue, extinguishing fires, crawling and lifting and carrying hoses, ladders and people (Tr. 124).  He reported that at work he typically walked, stood, sat, climbed, knelt, crouched and reached for three hours per day; stooped, wrote, typed and handled large and small objects for two hours per day and crawled two and one half hours per day (Tr.

3

124).  Plaintiff claimed that he frequently lifted fifty pounds as a firefighter (Tr. 124).

Plaintiff reported that beginning on January 1, 2011, the date of the alleged onset of disability, he worked "light duty" with the fire department, answering phones until February 23, 2011 (Tr. 32, 122).  After his first knee surgery on February 24, 2011, plaintiff alleges he was not allowed to return to performing light duty work at the firehouse because "[t]he Village of Scarsdale does not have a light duty position" (Tr. 32, 122).  Plaintiff reported that he applied for retirement on December 19, 2011 (Tr. 28, 32).

Plaintiff stated that he lives with his second wife, their three children[2], his mother-in-law and two dogs (Tr. 25-26, 130).  In a Function Report dated June 18, 2011, he reported that he and his wife take turns walking the dogs and, while his wife typically cooks, he is able to do laundry and wash dishes (Tr. 130-32).  Plaintiff wrote that he spent a typical day eating, showering, going for walks, sitting at the computer, talking on the phone, socializing, driving and feeding, playing with and caring for his children and pets (Tr. 130, 134, 139).  He also stated that "a couple of days a week I go to my scuba shop" (Tr.

---

[2]On May 24, 2012, plaintiff's twin daughters were 18 months old and his son was 2 weeks old (Tr. 25).

4

130, 139).[3]  Plaintiff reported that he was able to care for his personal needs, pay bills and handle finances and that he experienced no difficulties with co-workers, supervisors, authority figures or socializing with others (Tr. 130-31, 133-34, 136). Plaintiff stated that he has a driver's license and is able to drive (Tr. 132-33).  He wrote that his hobbies include scuba diving, watching television, playing the bagpipes and kayaking "whenever [he] can" (Tr. 133).

    C.  Plaintiff's
        Medical Background[4]

        1.  Information
           Reported by the Plaintiff

In the June 18, 2011 Function Report, plaintiff wrote that he first experienced non-radiating, "dull ach[ing] to stabbing" pain in his right knee, which affected his daily activities, on January 2, 2011, the day after he injured his knee at work (Tr. 137-38).  He reported that he could no longer kneel or squat because he had pain in his right knee "all of the time"

---

[3]The record does not contain any further information concerning plaintiff's activities at the scuba shop.  Neither plaintiff nor the ALJ explored whether those activities are relevant to plaintiff's disability claim.

[4]I recite only those facts relevant to my review.  The administrative record (Docket Item 24) more fully sets out plaintiff's medical history.

(Tr. 130, 134-35, 138, 146).  In addition, he stated he was unable to walk as far as he could before his injury, that he had difficulty sleeping because of knee pain, that his knee hurt "after prolonged standing" and that he walked with a "limp" (Tr. 130, 134-35, 139).  He wrote that he originally was prescribed hydrocodone[5] but that when the prescription ran out he began taking acetaminophen[6] and tramadol[7] twice a day (Tr. 139, 145).

    2.  <u>Treatment Records</u>

Plaintiff's medical records largely consist of the progress notes of his treating physician, Dr. Anthony Maddalo, an orthopaedic surgeon at Hudson Valley Bone & Joint Surgery, and the notes of his physical therapist at Summit Physical Therapy, Derrick May, to whom he was referred by Dr. Maddalo.

On January 5, 2011, Dr. Maddalo began treating plaintiff, for an injury he reportedly sustained when he slipped at work, twisting his right knee (Tr. 215).  While Dr. Maddalo noted some tenderness in plaintiff's knee, an x-ray showed no "evidence

---

[5]Hydrocodone is a "narcotic analgesic" or pain reliever. <u>Dorland's Illustrated Medical Dictionary</u> ("<u>Dorland's</u>") at 71, 783 (27th ed. 1988).

[6]Acetaminophen is a nonprescription pain reliever with "weak anti-inflammatory effects."  <u>Dorland's</u> at 12.

[7]Tramadol is a pain reliever.  <u>Dorland's</u> at 1742.

of acute injury" (Tr. 215).  Dr. Maddalo tentatively diagnosed
plaintiff with "a medial collateral ligament ["MCL"] injury[8] and
possibly a medial meniscal injury[9]," prescribing anti-inflamma-
tory medication and physical therapy ("PT") (Tr. 215).  He
recommended that plaintiff not return to work because "he
limp[ed] significantly because of pain" (Tr. 215).

On January 10, 2011, plaintiff began attending PT three
times per week (Tr. 167).  Plaintiff reported that his knee was
"still giving out" and that he was wearing a knee brace and
performing "light duty" work (Tr. 167).  The physical therapist
ordered therapeutic exercises and ultrasound therapy and directed
plaintiff to ice his knee (Tr. 167).  During the first week of
PT, plaintiff reported increased stability and balance but
continued to report knee pain (Tr. 168-71, 173).  On January 24,
2011, plaintiff stated that his right knee was "stronger and not
really painful while wearing [the] brace," but his left knee was
buckling and "bothering" him (Tr. 172).  Plaintiff continued to

---

[8]An MCL injury is an injury, such as a stretch or tear, to
the ligament on the inner part of the knee."  U.S. National
Library of Medicine, National Institutes of Health, Medline Plus
Medical Encyclopedia, "Medial Collateral Ligament (MCL) Injury of
the Knee," http://www.nlm.nih.gov/medlineplus/ency/article/
001076.htm (last visited May 27, 2015).

[9]A medial meniscus injury is an injury to the "crescent-
shaped disk of fibrocartilage attached to the . . . tibia," or
shin bone, between the femur, or thigh bone, and the tibia at the
knee.  Dorland's at 617, 923, 1005, 1722.

report pain in both knees and buckling of the left knee (Tr. 174-78).

On February 8, 2011, Dr. Maddalo examined plaintiff, noting "some atrophy" in his right leg, as well as pain from the patellofemoral joint[10] and medial joint line tenderness (Tr. 216, 232).  He recommended that plaintiff not return to work because he could not "bear full weight on his right knee without discomfort" (Tr. 216).  Plaintiff continued PT (Tr. 178, 181).

On February 14, 2011, an MRI of plaintiff's right knee revealed (1) a "[s]mall suprapatellar joint effusion,"[11] (2) a "[h]orizontal tear of the posterior horn of the medial meniscus reaching the inferior articular surface" and (3) "bone marrow edema and cystic changes" beneath the joint cartilage (Tr. 222). Plaintiff continued PT (Tr. 182-83, 185, 197).

On February 24, 2011, plaintiff underwent arthroscopic surgery performed by Dr. Maddalo (Tr. 231, 250-53).  Dr. Maddalo performed a meniscectomy, removing "a flap tear in [the medial meniscus] midportion" of the right knee (Tr. 231).  Dr. Maddalo diagnosed plaintiff with (1) a "torn right medial meniscus" and

---

[10]The patellofemoral joint is the joint between the femur and the patella, or knee cap.  Dorland's at 1241.

[11]A suprapatellar joint effusion is a collection of fluid above the knee cap.  Dorland's at 532, 1615.

(2) an "osteochondral injury"[12] to the femur at the knee joint (Tr. 231, 247).

Plaintiff was evaluated the following day at PT (Tr. 166, 184, 193).  The physical therapist noted "great results" from the surgery with "significantly less pain" in plaintiff's knee (Tr. 166).  Plaintiff's gait was reportedly "less antalgic"[13] and, seated, his right knee flexion was 0 to 114 degrees and his motor strength was 4 out of 5 with right knee flexion at 90 degrees and right thigh flexion at 45 degrees (Tr. 166). Plaintiff's PT continued with therapeutic exercises and neuromuscular re-education, and he continued to report that his right knee was feeling better, with some intermittent pain post-surgery, and that his left knee was "still bothersome" (Tr. 186-87, 189, 191).

On March 8, 2011, Dr. Maddalo removed plaintiff's sutures and "warned against overexertion . . . since he did have some chondral injury[14] to his knee" (Tr. 217, 230).  Dr. Maddalo noted little swelling and that plaintiff's progress was good, but

_____

[12]An osteochondral injury is injury to the bone and cartilage.  Dorland's at 1198.

[13]An antalgic gait is assumed in an effort to lessen or avoid pain.  Dorland's at 95.

[14]A chondral injury is an injury to cartilage.  Dorland's at 325.

he determined that plaintiff could not "go back to duty as a
firefighter because of weakness in his knee" (Tr. 217).  Plain-
tiff continued PT, reporting that his right knee felt better (Tr.
188, 190, 192, 194).  However, on March 18, 2011, plaintiff
reported that his right knee was "a little bothersome with
increased activity[] and kneeling" (Tr. 195).  At subsequent PT
sessions, plaintiff continued to report pain with bending and
kneeling, claiming it was a "different pain from before" (Tr.
195-96, 201, 243).

At an April 5, 2011 appointment with Dr. Maddalo,
plaintiff reported some intermittent pain and an inability to
kneel directly on his right knee, which Dr. Maddalo attributed to
a "trochlear lesion," a lesion of bone or cartilage on the back
of his knee (Tr. 218, 229).  Dr. Maddalo wrote that "[s]ince
[plaintiff] is a fireman and must kneel and crouch for certain
activities[,] I do not think he should go back to full duty just
yet" (Tr. 218).  At subsequent PT sessions, plaintiff continued
to report intermittent knee pain and difficulty from the
osteochondral lesion, including "catching and locking," falling,
inability to kneel, thigh spasms and his knee "giving out" (Tr.
198-99, 202-05, 207-08, 210, 241-42).

On May 17, 2011, Dr. Maddalo attributed plaintiff's
symptoms to the chondral injury, noting "grade 3 to 4" changes in

his knee joint (Tr. 165, 219, 228).  While Dr. Maddalo injected
plaintiff's right knee with a corticosteroid[15] "to control his
pain during activities of daily living," he did not think it
would enable him to kneel or squat (Tr. 165).  He determined that
plaintiff had "a permanent partial disability at [the] time and .
. . that this most likely w[ould] not resolve short of any major
operative intervention" (Tr. 165).  Moreover, Dr. Maddalo wrote,
"I think that he may have to think about changing his job de-
scription since I do not think he will be able to kneel on this
knee directly without pain in the future" (Tr. 165).  Plaintiff
reported some pain relief from the injection, but he was still
unable to kneel or squat (Tr. 206, 209, 213, 238).  After a week,
plaintiff began to report increased pain (Tr. 211-12, 220, 227,
239-40).  Plaintiff's final PT session was May 27, 2011 (Tr.
212).

Dr. Maddalo administered Orthovisc[16] injections to
plaintiff's right knee on June 14, 22 and 30, 2011 (Tr. 220-21,

---

[15]A corticosteroid acts as an anti-inflammatory.  Dorland's
at 387.

[16]Orthovisc is "a solution of sodium hyaluronate, a thick
(viscous) substance that is naturally present in the knee joint .
. . [injected] to relieve pain from osteoarthritis."  U.S.
Department of Health & Human Services, U.S. Food and Drug
Administration, Medical Devices, "Orthovisc High Molecular Weight
Hyaluronan - P030019," http://www.fda.gov/MedicalDevices/Products
andMedicalProcedures/DeviceApprovalsandClearances/Recently-
ApprovedDevices/ucm081228.htm (last visited May 27, 2015).

225-27).  Plaintiff's knee appeared to show some improvement (Tr. 225-27).

    3.  Consultative Examinations

On May 17, 2011, Dr. Lawrence Schulman, a New York State licensed and Board Certified orthopaedic surgeon, conducted an independent consultative examination of plaintiff for the Workers' Compensation Board (Tr. 233-37).[17]

Plaintiff reported that while working as a firefighter he "slipped and fell on construction debris that was covered by snow, sustaining a twisting injury to his right knee" (Tr. 233). At the time of the examination, plaintiff was taking 10 mg of hydrocodone as needed to manage his pain (Tr. 234).  Plaintiff stated that he had right knee "discomfort" when using stairs, that he was unable to kneel, squat or run, that his right knee had previously buckled and that he had "occasional night pain" (Tr. 234).

> Upon examination, Dr. Schulman wrote that plaintiff's
>
> gait was excellent.  Heel and toe standing could be done well.  He had good alignment of his knees.  He had difficulty doing a squat and kneeling on the right

---

[17]The ALJ relied on this examination in making his determination.  At the hearing, plaintiff declined the ALJ's offer to seek another consulting physician opinion for the SSA proceedings (Tr. 34).

side.  He had full extension of the right knee and full
flexion to 135 degrees equivalent to the left knee.
There was no swelling of the right knee and no atrophy
with circumferential measurements being equal with the
left side.  Medial and lateral collateral ligaments
were stable to stress. . . .  He had slight
popliteal[18] fullness on the right. . . .  No crepi-
tus[19] was noted.  He had slight tenderness over the
right medial joint line and over the right anterior
medial femoral condyle graded as 1+. . . .  There was
no pain with patellofemoral compression or peripatella
tenderness

(Tr. 234-35).  Dr. Schulman diagnosed plaintiff with "[t]raumatic

internal derangement right knee with torn medial meniscus and

traumatic chondromalacia lesions[20]" of the femur at the knee

(Tr. 235).  He determined that plaintiff had a "temporary mild

partial disability" which rendered him unable to return to work

as a fireman (Tr. 236).  Dr. Schulman wrote that plaintiff's

prognosis was fair to good with room for continued improvement

(Tr. 236).  Ultimately, Dr. Schulman concluded that plaintiff was

"capable of light duty work without any kneeling, squatting,

crawling, climbing or jumping" (Tr. 236).

---

[18]Popliteal refers to the back of the knee.  Dorland's at
1337.

[19]Crepitus is defined as "the grating sensation caused by
the rubbing together of the dry synovial surfaces of joints" or
"the crackling sound produced by the rubbing together of
fragments of fractured bone."  Dorland's at 395.

[20]Chondromalacia lesions form as the result of the softening
or degeneration of the cartilage.  Dorland's at 326.

13

On July 19, 2011, H. Barrett, an examiner for the SSA,[21] completed a Physical Residual Functional Capacity Assessment on plaintiff (Tr. 46-51).  Barrett listed plaintiff's exertional limitations as lifting or carrying twenty-five pounds frequently and fifty pounds occasionally, standing or walking a total of six out of eight hours at work per day and sitting a total of six out of eight hours at work per day (Tr. 47). Barrett determined that plaintiff's limitations included occasional climbing, balancing, stooping, kneeling, crouching and crawling (Tr. 48).  Barrett made no credibility assessment (Tr. 50).

4.  <u>Additional Evidence</u>

Plaintiff submitted additional treatment records to the Appeals Council (Tr. 261-67), as well as a letter challenging the ALJ's decision (Tr. 162-64).

---

[21]Barrett is one of the SSA's "single decision makers" or "non-physician disability examiners who may make the initial disability determination in most cases without requiring the signature of a medical consultant." <u>Martin v. Astrue</u>, No. 7:10-CV-1113 (TJM), 2012 WL 4107818 at *15 (N.D.N.Y. Sept. 19, 2012) (internal quotation marks and citation omitted).  The record does not disclose what qualifications, if any, Barrett has to make disability determinations.

a.  <u>Dr. Schulman</u>

Dr. Schulman re-examined plaintiff on April 2, 2013, after the ALJ's decision (Tr. 262).  At the time, plaintiff was wearing a hinged knee brace for support and reported that the corticosteroid and Orthovisc injections administered by Dr. Maddalo had been unsuccessful (Tr. 262).  Plaintiff stated that Dr. Maddalo recommended surgery -- "a lateral release and arthro-scopic debridement"[22] (Tr. 262).  Plaintiff reported that he was still unable to kneel, squat or run, had no stability in his right knee, had "discomfort" using stairs and had occasional swelling and persistent pain, which he managed with over-the-counter Aleve[23] (Tr. 262-63).

Dr. Schulman noted that plaintiff's "gait was good," that he could not squat or kneel, that there was swelling and tenderness in the right knee and that plaintiff had a "small

---

[22]Lateral release surgery involves cutting the lateral retinaculum tendon to loosen the knee and correct malalignment, and debridement involves "removing damaged articular cartilage." Carolyn M. Hettrich & Daniel Liechti, "Patellofemoral Pain Syndrome," <u>OrthoInfo</u>, American Academy of Orthopaedic Surgeons, http://orthoinfo.aaos.org/topic.cfm?topic=A00680 (last visited May 27, 2015).

[23]Aleve or naproxen is "a nonsteroidal anti-inflammatory." <u>Dorland's</u> at 1098.

osteophyte[24] at the medial joint line" (Tr. 263).  He diagnosed plaintiff with "[t]raumatic internal derangement of right knee with mild degenerative joint disease of the knee involving the medial compartment and patellofemoral area with a mild genu varum deformity[25]" (Tr. 263).  Dr. Schulman concluded that surgery would not be beneficial and recommended conservative treatment with physical therapy and injections (Tr. 263-64).  Moreover, he wrote that

> [f]urther reconstructive surgery at this point in the form of joint replacement should be delayed as well. [Plaintiff] ultimately, in the future, years down the road, may actually need a total knee replacement on the right.  I would delay that at this point in time. Conservative treatment should be continued

(Tr. 264).

### b. Plaintiff's August 21, 2013 Surgery

On August 21, 2013, Dr. Corey Burak, an orthopaedic surgeon, assisted by Dr. Maddalo, performed a "right knee medial compartment arthroplasty"[26] on plaintiff (Tr. 266-67).  Dr. Burak

---

[24]An osteophyte is a bony outgrowth.  Dorland's at 1200.

[25]Genu varum deformity is also called bowleggedness. Dorland's at 687.

[26]A right knee medial compartment arthroplasty is a partial knee replacement of the inner part of the knee.  Jared R. H. Foran, "Unicompartmental Knee Replacement," OrthoInfo, American
(continued...)

noted plaintiff's "long history of degenerative joint disease" and diagnosed plaintiff with "right knee medial compartment arthritis" (Tr. 266).

    D.  Proceeding
       Before the ALJ

    Plaintiff was represented by Attorney Michael S. Weiss, Esq. at the May 24, 2012 hearing (Tr. 21-45).  On May 15, 2012, Attorney Weiss submitted a Pre-Hearing Memorandum to the ALJ, arguing that plaintiff should "grid out" because, at fifty, he was "an individual closely approaching advanced age who, although a high school graduate, has been a firefighter whose skills do not transfer" (Tr. 160-61).

    At the hearing, the ALJ asked plaintiff what prevented him from working (Tr. 29).  Plaintiff responded that he still could not kneel or squat, that he has constant "sharp" pain in his right knee and that he needed surgery to relieve that pain (Tr. 29, 31).  He testified that Aleve dulled the pain but it never went away (Tr. 31).[27]  When the ALJ asked plaintiff if he agreed with Dr. Schulman's opinion that he could do light duty

---

    [26](...continued)
Academy of Orthopaedic Surgeons, http://orthoinfo.aaos.org/
topic.cfm?topic=A00585 (last visited May 27, 2015).

    [27]However, plaintiff acknowledged that Aleve was sufficient
to manage his pain at the time of the hearing (Tr. 40).

work that did not require kneeling, squatting, crawling or jumping, plaintiff testified that he did light duty work at the firehouse until his February 24, 2011 surgery, after which he was told not to return because there was no "light duty" position (Tr. 31-32).

Plaintiff reported that he could walk at least fifteen minutes without rest and that he could sit or stand for twenty minutes at a time (Tr. 36, 38).  He testified that he could bend from the waist and lift twenty-two pounds but that it hurt to bend his knees to lift and he could not squat (Tr. 36-37).  He also reported "tossing and turning" at night, averaging four hours of sleep at a time (Tr. 40).

Plaintiff testified that only Dr. Maddalo had treated him for his injury (Tr. 34).  In response to Attorney Weiss' questions, plaintiff reported that Dr. Maddalo recommended a second surgery as soon as possible, which would prevent him from bearing any weight on his right leg for two months (Tr. 43). Plaintiff also testified that he was currently receiving a pension, but had he not been injured, his pension would have increased after his twenty-ninth year of employment[28] (Tr. 41).

---

[28]Plaintiff was injured during his twenty-eighth year of employment at the fire department (Tr. 40).

18

In closing, Attorney Weiss argued that while plaintiff was forty-nine at the time of his injury, (1) he was rendered totally disabled for a period of time after the February 24, 2011 surgery, at least through October 2011, and (2) plaintiff "grid-[ded] out" when he turned fifty on October 5, 2011, because plaintiff was unable to return to work as a fireman and he was closely approaching advanced age with a high school education and non-transferable skills (Tr. 43-44).   Thus, Attorney Weiss argued, plaintiff was disabled as of February 24, 2011 (Tr. 44).

III.  <u>Analysis</u>

    A.  Applicable
        <u>Legal Principles</u>

      1.  <u>Standard of Review</u>

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.   42 U.S.C. § 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it

determine whether the Commissioner's conclusions were supported by substantial evidence. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.); accord Johnson v. Bowen, supra, 817 F.2d at 986, but "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, supra, 817 F.2d at 986.

        "'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is

required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'"  Selian v. Astrue, supra, 708 F.3d at 417, quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam).  Where, as here, the claimant has submitted new evidence to the Appeals Council following the ALJ's decision, such evidence becomes part of the administrative record.  See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).

        2.  Determination
           of Disability

     A claimant is entitled to DIB if he can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months).[29]  The impairment must be demonstrated by "medi

---

[29]The standards that must be met to receive Supplemental Security Income benefits under Title XVI of the Act are the same as the standards that must be met in order to receive DIB under Title II of the Act.  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).
                    (continued...)

cally acceptable clinical and laboratory diagnostic techniques,"
42 U.S.C. § 423(d)(3), and it must be "of such severity" that the
claimant cannot perform his previous work and "cannot, consider-
ing [the claimant's] age, education, and work experience, engage
in any other kind of substantial gainful work which exists in the
national economy."  42 U.S.C. § 423(d)(2)(A).  Whether such work
is actually available in the area where the claimant resides is
immaterial.  42 U.S.C. § 423(d)(2)(A).

    In making the disability determination, the Commis-
sioner must consider:  "(1) the objective medical facts; (2)
diagnoses or medical opinions based on such facts; (3) subjective
evidence of pain or disability testified to by the claimant or
others; and (4) the claimant's educational background, age, and
work experience."  Brown v. Apfel, supra, 174 F.3d at 62 (inter-
nal quotation marks and citation omitted); DiPalma v. Colvin, 951
F. Supp. 2d 555, 565 (S.D.N.Y. 2013) (Peck, M.J.).

    The Commissioner must follow the five-step process
required by the regulations.  20 C.F.R. § 404.1520(a)(4)(i)-(v).
The first step is a determination of whether the claimant is
engaged in substantial gainful activity.  20 C.F.R.

---

    [29](...continued)
Accordingly, cases addressing the former are equally applicable
to cases involving the latter.

§ 404.1520(a)(4)(i).  If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment."  20 C.F.R. § 404.1520(a)(4)(ii).  If he does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii). If the answer to this inquiry is affirmative, the claimant is disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform his past relevant work given his RFC.  20 C.F.R. § 404.1520(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25.  If he cannot, then the fifth step requires assessment of whether, given claimant's RFC, he can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4)(v).  If he cannot, he will be found disabled.  20 C.F.R. § 404.1520(a)(4)(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151.

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).  To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions

and assess[es] his or her work-related abilities on a
function-by-function basis, including the functions in paragraphs
(b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945."
Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per
curiam), quoting SSR 96-8p, 1996 WL 374184 at *1 (July 2, 1996).
The results of this assessment determine the claimant's ability
to perform the exertional demands of sustained work which may be
categorized as sedentary, light, medium, heavy or very heavy.  20
C.F.R. § 404.1567; see Rodriquez v. Apfel, 96 Civ. 8330 (JGK),
1998 WL 150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).
This ability may then be found to be limited further by nonexer-
tional factors that restrict claimant's ability to work.[30]  See
Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in
part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005); Bapp
v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986).

     The claimant bears the initial burden of proving
disability with respect to the first four steps.  Selian v.
Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537
F.3d at 128.  Once the claimant has satisfied this burden, the

---

     [30]Nonexertional limitations or restrictions are those that
affect claimant's ability to perform work related functions and
include, among other things, "difficulty performing the
manipulative or postural functions of some work such as reaching,
handling, stooping, climbing, crawling, or crouching."  20 C.F.R.
§ 404.1569a(c).

burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than his past work.  Selian v. Astrue, supra, 708 F.3d at 418; Butts v. Barnhart, supra, 388 F.3d at 383.

In some cases, the Commissioner can rely exclusively on the medical-vocational guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step.  Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995).  "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy."  Gray v. Chater, supra, 903 F. Supp. at 298; Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work."  Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir 1986); accord Butts v. Barnhart, supra, 388 F.3d 383 (internal quotation omitted).  "'[S]ignficiantly diminish' . . . mean[s] the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment

25

opportunity." Bapp v. Bowen, supra, 802 F.2d at 606; accord
Selian v. Astrue, supra, 708 F.3d at 42; Zabala v. Astrue, 595
F.3d 402, 411 (2d Cir. 2010).  This "intermediate question --
whether the range of work [claimant] could perform was so signif-
icantly diminished as to require the introduction of vocational
testimony" -- need not be answered using a vocational expert.
Bapp v. Bowen, supra, 802 F.2d at 606.  Where the ALJ relies
exclusively on the Grids in concluding that plaintiff is not
disabled, the ALJ is not required to identify specific jobs that
plaintiff could perform.  Calabrese v. Astrue, 358 F. App'x 274,
276 (2d Cir. 2009), citing Heckler v. Campbell, supra, 461 U.S.
at 470.  However, if the ALJ finds that the nonexertional limita-
tions significantly diminish a claimant's ability to work, then
the Commissioner must introduce the testimony of a vocational
expert or other similar evidence in order to prove "that jobs
exist in the economy which the claimant can obtain and perform."
Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation
marks and citations omitted); see 20 C.F.R. §§ 404.1569a(d), Pt.
404, Subpt. P, App. 2, § 200.00(e); see also Heckler v. Campbell,
461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities
are not described accurately by a rule, the regulations make
clear that the individual's particular limitations must be
considered.").

B.   The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2015 (Tr. 13).  At step one, the ALJ found that plaintiff had not engaged in sub-stantial gainful activity since January 1, 2011 (Tr. 13).  At step two, the ALJ found that plaintiff had severe impairments, including "status post right knee arthroscopic medial meniscecto-my and degenerative disease at the medial femoral condyle" (Tr. 13).  At step three, the ALJ found that plaintiff did not meet any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 13).

The ALJ then determined that plaintiff had the RFC to perform a range of light work[31], with the following further limitations:  plaintiff "must avoid squatting, climbing stairs, kneeling, or crawling" (Tr. 14).  The ALJ concluded that plain-tiff could perform light duty work because he could lift up to twenty pounds, he could stand and/or walk for six hours in an

---

[31]"Light work involves lifting no more than 20 pounds at a time with frequent lifting and carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. § 404.1567(b).

eight hour workday and "the record contains no positive findings that show any limitations have been imposed on [plaintiff's] ability to sit" (Tr. 14).

In making this determination, the ALJ considered plaintiff's allegations and the medical record (Tr. 14).  With respect to plaintiff's credibility, the ALJ found that

> [h]is testimony at the hearing is somewhat credible with regard to his inability to lift heavy weights and his inability to climb stairs for extensive periods of time; however, such testimony is not consistent with allegations of otherwise total disability, as they are not reasonably related to the findings contained upon examination.  Specifically, even though [plaintiff] complains of significant knee pain which precludes him from sitting or standing longer than 20 minutes, over-all, evaluations indicate only mild knee swelling and weakness for a short period following surgery

(Tr. 15).  Moreover, the ALJ found that "[d]espite complaints of chronic right knee pain with numbness, diagnostic testing has yielded little in the way of objective findings which correlate with [plaintiff's] complaints to the degree alleged" (Tr. 14).

The ALJ gave "some weight" to Dr. Schulman's opinion that plaintiff "could perform light duty work that did not require any crawling, kneeling, squatting, climbing, or jumping" because it was consistent with his own examination of plaintiff, as well as Dr. Maddalo's progress notes "which fail to demon-strate any significant pain, or weakness and which show some

28

continued buckling, but generally only with squatting, kneeling
and climbing stairs" (Tr. 15).

The ALJ also reviewed and considered Dr. Maddalo's
opinion that plaintiff could not return to work as a firefighter
because he could not kneel, noting that Dr. Maddalo did not
indicate that plaintiff could not work altogether; rather, Dr.
Maddalo merely recommended that plaintiff consider changing job
duties (Tr. 15).   The ALJ wrote that Dr. Maddalo consistently
reported that plaintiff's intermittent knee pain prevented him
from kneeling or squatting, but that Dr. Maddalo placed no other
limitations on plaintiff's activities (Tr. 15).   The ALJ noted
that both Dr. Maddalo's notes, as well as plaintiff's PT records,
indicated some improvement as a result of his first surgery, the
corticosteroid and Orthovisc injections and PT (Tr. 14-15).

With regard to plaintiff's pain, the ALJ stated that
the progress notes indicated that plaintiff's pain was "mild and
intermittent," that plaintiff often acknowledged improvement and
that plaintiff only needed an over-the-counter pain reliever to
manage it (Tr. 16).   Finally, the ALJ noted that the progress
notes stated that plaintiff "walked with a normal gait and had no
residual joint instability while walking or standing" and that
"physicians placed no restriction on [plaintiff's] ability to

walk, sit, stand, lift or carry, but advised only against kneel-
ing and squatting" (Tr. 16).

　　　　At step four, the ALJ concluded that plaintiff was
unable to perform past relevant work as a firefighter (Tr. 16).

　　　　At step five, the ALJ found that jobs existed in
significant numbers in the national economy that plaintiff could
perform, given his RFC, age, education and work experience (Tr.
16).  He found that at the alleged onset of disability, plaintiff
was a "younger individual" but that when he turned fifty he
became an individual "closely approaching advanced age" (Tr. 16).
The ALJ determined that plaintiff had at least a high school
education and could communicate in English (Tr. 16).  The ALJ
next found that it was immaterial whether plaintiff's job skills
were transferrable to other employment (Tr. 16, <u>citing</u> SSR 82-41,
1982 WL 31389 (January 1, 1982); 20 C.F.R. Pt. 404, Subpt. P,
App. 2).  In addition, he determined that plaintiff's "additional
limitations have little or no effect on the occupational base of
unskilled light work" (Tr. 17).  Based on these vocational
factors and plaintiff's RFC, the ALJ applied Grid Rules 202.21
and 202.14, 20 C.F.R. Pt. 404, Subpt. P, App. 2, and concluded
that plaintiff was not disabled from January 1, 2011 through
August 30, 2012 (Tr. 16-17).  The ALJ did not call a vocational
expert.

C.  Analysis of the
    ALJ's Decision

        Plaintiff challenges only the ALJ's reliance on the
Grids at step five of his analysis.  Specifically, plaintiff
contends that the ALJ "neglect[ed] to provide any proof" to
support his conclusion that "'there are jobs that exist in
significant numbers in the national economy that the claimant can
perform' . . . , even failing to produce a vocational expert,
thereby failing to meet the Commissioner's burden of proof"
(Memorandum of Law in Support of Plaintiff's Motion for Judgment
on the Pleadings, dated August 18, 2014 (Docket Item 19) at 3,
citing Tr. 16).  The Commissioner argues that the ALJ's reliance
on the Grids was proper because the ALJ determined that plain-
tiff's nonexertional limitations -- limited abilities to squat,
climb stairs, kneel or crawl -- would have "little or no effect"
on the occupational base for light work and, therefore, the ALJ
was not required to call a vocational expert to determine whether
plaintiff was disabled and could rely exclusively on the Grids
(Defendant's Reply Memorandum in Further Support of Her Motion
for Judgment on the Pleadings and in Opposition to Plaintiff's
Cross Motion for Judgment on the Pleadings, dated September 16,
2014 (Docket Item 22) ("Def.'s Reply") at 1-2).  The Commissioner
further contends that the ALJ's finding that plaintiff is not

31

disabled is supported by substantial evidence (Memorandum of Law
in Support of the Commissioner's Motion for Judgment on the
Pleadings, dated July 16, 2014 (Docket Item 15), at 19; Def.'s
Reply at 1-2).

Where, as here, a claimant has nonexertional limita-
tions, the ALJ must determine whether the impact of his nonex-
ertional limitations on the range of work he could perform is
negligible.  See Bapp v. Bowen, supra, 802 F.2d at 606.  If the
impact is negligible, the ALJ may rely exclusively on the Grids,
but, as explained above, if the nonexertional limitations signif-
icantly diminish the range of work the claimant can perform, the
ALJ must seek the testimony of a vocational expert to determine
whether the claimant is disabled.  See Selian v. Astrue, supra,
708 F.3d at 421.  The ALJ's determination of whether the impact
of the nonexertional limitations is negligible must be supported
by substantial evidence.  See Bapp v. Bowen, supra, 802 F.2d at
605.

The ALJ determined that plaintiff was able to perform
light work so long as he avoided "squatting, climbing stairs,
kneeling, and crawling" (Tr. 14).  The ALJ next determined that
"the additional limitations have little or no effect on the
occupational base of unskilled light work" (Tr. 17).  Because the
ALJ determined that plaintiff's nonexertional limitations did not

32

significantly diminish the range of light work available, if that determination is correct, the ALJ did not commit legal error by not seeking a vocational expert's opinion and using the Grids exclusively to determine plaintiff's disability status.  See Weed Covey v. Colvin, --- F. Supp. 3d ---, ---, No. 13-CV-6602 (EAW), 2015 WL 1541864 at *18 (N.D.N.Y. Apr. 6, 2015) (concluding ALJ did not err where ALJ identified plaintiff's nonexertional limitations and determined they had "little or no effect on the occupational base of" work and relied exclusively on the Grids (internal quotation marks omitted)); Carattini v. Colvin, 13 Civ. 7806 (ALC), 2015 WL 1499509 at *12 (S.D.N.Y. Mar. 31, 2015) (Carter, D.J.) (same); Castle v. Comm'r of Soc. Sec., No. 1:13-cv-543 (GLS), 2014 WL 2215759 at *3 (N.D.N.Y. May 29, 2014) (same); Baszto v. Astrue, 700 F. Supp. 2d 242, 251-52 (N.D.N.Y. 2010) (same).

        In making his determination, the ALJ cited SSR 85-15, which states, in part, that "[l]imitations in climbing . . . can have varying effects on the occupational base, . . . [and w]here the effects of a person's actual limitations of climbing . . . on the occupational base are difficult to determine, the services of a [vocational expert] may be necessary."  SSR 85-15, 1985 WL 56857 at *6 (January 1, 1985).  Thus, whether testimony of a vocational expert is needed to determine the effect of climbing

limitations on a claimant's occupational base should be decided on a case-by-case basis.  SSR 85-15, 1985 WL 56857 at *6; see also Bapp v. Bowen, supra, 802 F.2d at 605.  Thus, plaintiff's limited ability to climb does not, per se, significantly limit the range of work available to plaintiff.  Moreover, kneeling and "[c]rawling on hands and knees and feet [are] relatively rare activit[ies] even in arduous work, and limitations on [them] would be of little significance in the broad world of work."  SSR 85-15, 1985 WL 56857 at *7.  Finally, the limitation on squatting does not significantly diminish the occupational base available to plaintiff.  Britt v. Astrue, 486 F. App'x 161, 164 (2d Cir. 2012) (summary order).[32]  Thus, the ALJ was not required to seek testimony from a vocational expert based on the nature of plaintiff's nonexertional limitations.

Finally, the ALJ's determination that plaintiff's nonexertional limitations did not significantly diminish the occupational base available to him is amply supported by substan-

---

[32]In Britt v. Astrue, supra, 486 F. App'x at 164, the ALJ determined that the plaintiff had the RFC to perform sedentary work with nonexertional limitations prohibiting kneeling, squatting and climbing stairs.  A claimant who can do light work, logically, "can also do sedentary work."  See 20 C.F.R. § 404.1567(b).  Because a limitation on squatting does not significantly diminish the number of sedentary jobs available to plaintiff, the ALJ was not required to seek the opinion of a vocational expert.

tial evidence, including Dr. Maddalo's progress notes, plain-
tiff's PT treatment records and Dr. Schulman's consultative
examination.  The record reflects that plaintiff had intermittent
right knee pain (Tr. 165, 168-73, 177-78, 186-96, 210, 213, 216,
218, 225-27, 234, 241), had some right knee "discomfort" using
stairs (Tr. 193, 234) and was unable to squat or kneel on his
right knee (Tr. 29, 31, 130, 138, 146, 165, 195, 213, 218, 234).
Dr. Maddalo also noted some atrophy in plaintiff's right leg
prior to his first surgery (Tr. 216).

        However, plaintiff's testimony that he suffered con-
stant "sharp" pain in his right knee and that he could neither
sit nor stand longer than twenty minutes is inconsistent with the
record (see Tr. 31, 36, 38).  For example, plaintiff reported
that he was able to perform the basic activities of daily living,
including caring for his children and pets, grooming, driving,
doing laundry, washing dishes and managing finances (Tr. 130-33).
He testified that he could walk at least fifteen minutes without
resting, that he could lift twenty-two pounds while bending at
the waist and that he was able to manage his pain with over-the-
counter Aleve (Tr. 31, 36-37, 40).  In addition, after his
meniscectomy, both plaintiff's physical therapist and Dr. Maddalo
noted that plaintiff made good progress in his recovery, that his
gait was improved and that his pain had diminished (Tr. 166,

217).  Plaintiff also obtained some relief, albeit temporary, from the corticosteroid and Orthovisc injections administered by Dr. Maddalo (Tr. 206, 209, 213, 225-27).

During plaintiff's arthroscopic surgery, Dr. Maddalo diagnosed plaintiff with a chondral injury and plaintiff developed a lesion on the back of his right knee (Tr. 218, 231). Plaintiff reported increased problems related to the lesion, including his knee "catching and locking" and some pain (Tr. 198, 202-04, 210).  Although Dr. Maddalo noted grade 3 to 4 changes in plaintiff's right knee, he also reported that plaintiff had a good range of motion (Tr. 165, 225).  Dr. Maddalo concluded that only plaintiff's ability to kneel and squat were restricted and recommended that plaintiff seek alternate employment (Tr. 165).

Dr. Schulman's assessment was consistent with plaintiff's treatment notes.  He agreed that plaintiff should not kneel or squat and further recommended that plaintiff avoid crawling, climbing or jumping (Tr. 236).  Dr. Schulman noted that plaintiff had a good gait, full extension and flexion in the right knee, no crepitus and slight tenderness in his right knee (Tr. 234-35).  In light of the medical evidence and plaintiff's subjective reports and testimony, the record contains sufficient evidence to support the ALJ's determination that plaintiff's

nonexertional limitations would not significantly diminish the
light duty jobs available to plaintiff.

Accordingly, the ALJ did not commit legal error in
relying exclusively on the Grids, and his determination that
plaintiff was not disabled was supported by substantial evidence.

IV.   Conclusion

For all the foregoing reasons, the Commissioner's
motion is granted, and plaintiff's motion is denied.

Dated:   New York, New York
         June 5, 2015

                              SO ORDERED


                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

Barry I. Weiss, Esq.
Freedman, Wagner, Tabakman & Weiss
Suite 202
130 North Main Street
New City, New York   10956

Fergus J. Kaiser, Esq.
Special Assistant United States Attorney
Southern District of New York
Room 3904
26 Federal Plaza
New York, New York   10278